**PUBLIC VERSION**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITIGROUP INC., | |
| Plaintiff, | |
| v. | |
| AT&T INC.; AT&T SERVICES, INC.; AT&T INTELLECTUAL PROPERTY LLC; and AT&T INTELLECTUAL PROPERTY II, L.P., | CASE NO. 1:16-cv-04333-KBF-RLE |
| Defendants. | |

## PLAINTIFF CITIGROUP INC.'S MEMORANDUM
## IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

J. Kevin Fee (JF-5316)
MORGAN, LEWIS, & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC  20004
Phone: 202-739-3000

*Counsel for Plaintiff Citigroup Inc.*

# TABLE OF CONTENTS

**Page**

STATEMENT OF FACTS ............................................................................................. 2

    A.    Citigroup's Use of the THANKYOU Marks .............................................. 2

    B.    Citigroup's Registrations for the THANKYOU Marks.............................. 4

    C.    AT&T and Citigroup's Co-Branded Credit Cards and
           THANKYOU Customer Loyalty and Reward Programs ......................... 4

    D.    AT&T's Adoption of the "thanks" and "AT&T thanks"
           Trademarks .............................................................................................. 6

ARGUMENT ............................................................................................................... 8

    A.    Citigroup Is Likely to Succeed on the Merits of Its Claims ..................... 8

        1.    Citigroup's THANKYOU Marks are Valid and Protectable......... 9

        2.    AT&T Used the "thanks" and/or "AT&T thanks" Marks in
             Commerce .................................................................................... 9

        3.    AT&T's Use of the "thanks" and "AT&T thanks" Marks Is
             Likely to Cause Confusion........................................................... 10

             (a)    Citigroup's THANKYOU Marks are Strong................... 11

             (b)    AT&T's Marks Are Similar to Citigroup's
                   THANKYOU Marks......................................................... 14

             (c)    The Parties Offer Very Similar Services Under
                   Their Respective Marks .................................................. 18

             (d)    The Actual Confusion Factor Is Irrelevant or
                   Neutral.............................................................................. 19

             (e)    If AT&T Adopted Its "thanks" and "AT&T thanks"
                   Marks in Bad Faith, Then This Factor Also
                   Suggests a Likelihood of Confusion; Otherwise,
                   This Factor Is Neutral ..................................................... 20

             (f)    The Quality of Defendants' Services Are Irrelevant
                   Where Defendant Has Not Yet Fully Launched Its
                   Services .......................................................................... 21

             (g)    The Relevant Consumers Are Not Particularly
                   Sophisticated .................................................................. 21

             (h)    Summary of the Likelihood of Confusion Factors .......... 22

    B.    Citigroup Will Suffer Irreparable Harm Absent Injunctive Relief .......... 23

    C.    The Balance of Harms Weighs Heavily in Favor of Citigroup .............. 23

## TABLE OF CONTENTS
(continued)

                                                                              **Page**

D.     The Public Interest Weighs in Favor of Granting a Preliminary
       Injunction ................................................................................. 24

CONCLUSION .......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*1-800 Contacts, Inc. v. WhenU.com, Inc.*,
    414 F.3d 400 (2d Cir. 2005).................................................................................8

*A.T. Cross Co. v. Jonathan Bradley Pens Inc.*,
    470 F.2d 689 (2nd Cir. 1972)..............................................................................17

*Abercrombie & Fitch Co. v. Hunting World, Inc.*,
    537 F.2d 4 (2d Cir. 1976) ...................................................................................12

*Am. Home Prods. v. Johnson Chem. Co.*,
    589 F.2d 103 (2d Cir. 1978)................................................................................16

*BIC Corp. v. Far Eastern Source Corp.*,
    Case No. 99-civ-11385, 2000 U.S. Dist. LEXIS 18226 (S.D.N.Y. Dec. 19,
    2000) ...................................................................................................................15

*Birmingham v. Mizuno United States, Inc.*,
    Case No. 5-09-cv-566, 2011 U.S. Dist. LEXIS 34696 (N.D.N.Y. Mar. 31,
    2011) ...........................................................................................................15, 20

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*,
    973 F.2d 1033 (2d Cir. 1992)..............................................................................22

*Cadbury Beverages, Inc. v. Cott Corp.*,
    73 F.3d 474 (2d Cir. 1996).................................................................................21

*CBS Inc. v. Liederman*,
    866 F. Supp. 763 (S.D.N.Y. 1994)......................................................................22

*Clinique Labs., Inc. v. DEP Corp.*,
    945 F. Supp. 547 (S.D.N.Y. 1996)......................................................................14

*Davidoff SA v. CVS Corp.*,
    571 F.3d 238 (2d Cir. 2009)...............................................................................22

*Dreyfus Fund Inc. v. Royal Bank of Canada*,
    525 F. Supp. 1108 (S.D.N.Y. 1981)....................................................................21

*Eksouzian v. Albanese*,
    116 U.S.P.Q.2d 1972 (C.D. Cal. 2015)...............................................................15

*Erchonia Corp. v. Bissoon*,
    410 F. App'x 416 (2d Cir. 2011) .........................................................................13

*Famous Horse Inc. v. 5th Ave. Photo Inc.*,
   624 F.3d 106 (2d Cir. 2010)........................................................................16

*Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*,
   523 F.2d 1331 (2d Cir. 1975).....................................................................14

*Gucci Am., Inc. v. Gucci*,
   Case No. 07-civ-6820, 2009 U.S. Dist. LEXIS 124888 (S.D.N.Y. Aug. 5,
   2009) ...........................................................................................................14

*Harold F. Ritchie, Inc. v. Chesebrough—Pond's, Inc.*,
   281 F.2d 755 (2d Cir. 1960)................................................................14, 20

*Info. Superhighway, Inc. v. Talk Am., Inc.*,
   395 F. Supp. 2d 44 (S.D.N.Y. 2005)..........................................................22

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, Inc.*,
   Case No. 94-civ-2663, 1994 U.S. Dist. LEXIS 17182 (S.D.N.Y. Nov. 30,
   1994) ...........................................................................................................17

*Lane Capital Mgmt. v. Lane Capital Mgmt.*,
   192 F.3d 337 (2d Cir. 1999).......................................................................12

*Lang v. Retirement Living Publ'g Co.*,
   949 F.2d 576 (2d Cir. 1991).......................................................................18

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
   799 F.2d 867 (2d Cir. 1986)........................................................13, 17, 19

*Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*,
   426 F.3d 532 (2d Cir. 2005).......................................................................14

*Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*,
   679 F.3d 410 (6th Cir. 2012) .....................................................................16

*Masterpiece of Penn., Inc. v. Consol. Novelty Co.*,
   368 F. Supp. 550 (S.D.N.Y. 1973)............................................................16

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
   818 F.2d 254 (2d Cir. 1987).......................................................................20

*Nabisco, Inc. v. PF Brands, Inc.*,
   191 F.3d 208 (2d Cir. 1999).......................................................................22

*New Kayak Pool Corp. v. R&P Pools, Inc.*,
   246 F.3d 183 (2d. Cir. 2001)......................................................................11

*New York City Triathlon, LLC v. NYC Triathlon Club*,
  704 F. Supp. 2d 305 (S.D.N.Y. 2010) ........................................................................15, 23, 24

*Nike Inc. v. WNBA Enters. LLC*,
  85 U.S.P.Q.2d 1187 (TTAB 2007) ........................................................................................17

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm.
  Co.*,
  290 F.3d 578 (3d Cir. 2002) ..................................................................................................24

*Oral-B Labs., Inc. v. Mi-Lor Corp.*,
  810 F.2d 20 (2d Cir. 1987) ....................................................................................................15

*Paddington Corp. v. Attiki Imports & Distribs., Inc.*,
  996 F.2d 577 (2d Cir. 1993) ..................................................................................................20

*PaperCutter, Inc. v. Fay's Drug Co.*,
  900 F.2d 558 (2d Cir. 1990) ..................................................................................................13

*Playboy Enters. v. Chuckleberry Publ'g, Inc.*,
  486 F. Supp. 414 (S.D.N.Y. 1980) ........................................................................................16

*Playtex Prods. v. Georgia-Pacific Corp.*,
  390 F.3d 158 (2d Cir. 2004) ............................................................................................11, 22

*Polaroid Corp. v. Polarad Elecs. Corp.*,
  287 F.2d 492 (2d Cir. 1961) ............................................................................................10, 13

*Ritani, LLC v. Aghjayan*,
  880 F. Supp. 2d 425 (S.D.N.Y. 2012) ....................................................................................9

*Star Indus. v. Bacardi*,
  412 F.3d 373 (2d Cir. 2005) ..................................................................................................21

*Stern's Miracle-Gro Prods. Inc. v. Shark Prods. Inc.*,
  823 F. Supp. 1077 (S.D.N.Y. 1993) ......................................................................................23

*TCPIP Holding Co. v. Haar Commc'ns., Inc.*,
  244 F.3d 88 (2d Cir. 2001) ........................................................................................12, 19, 21

*Time, Inc. v. Petersen Publ'g Co.*,
  173 F.3d 113 (2d Cir. 1999) ..................................................................................................12

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
  511 F. App'x 81 (2d Cir. 2013) ..............................................................................................23

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
  800 F. Supp. 2d 515 (S.D.N.Y. 2011) ......................................................................19, 23, 24

*United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.*,
    128 F.3d 86 (2d Cir. 1997)....................................................................................10

*Virgin Enters. v. Nawab*,
    335 F.3d 141 (2d Cir. 2003)..................................................................11, 13, 18

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..................................................................................................8

## STATUTES

15 U.S.C. § 1065.......................................................................................................4

15 U.S.C. § 1072.....................................................................................................20

15 U.S.C. §1115(a) ...................................................................................................9

15 U.S.C. § 1115(b) ..................................................................................................9

15 U.S.C. § 1127.................................................................................................9, 10

N.Y. GEN. BUS. L. § 349 ........................................................................................23

Plaintiff Citigroup Inc. ("Citigroup"), by its attorneys, respectfully submits this memorandum in support of its Motion for a Preliminary Injunction against Defendants AT&T Inc., AT&T Intellectual Property LLC, AT&T Intellectual Property LLC, AT&T Intellectual Property II, L.P. (collectively, "Defendants" or "AT&T").

Since 2004, Citigroup has offered customer loyalty, reward, and redemption programs in connection with many of its credit cards under trademarks consisting of and/or containing the term THANKYOU.  Citigroup's THANKYOU program has been extremely popular with its customers, including more than 850,000 Citigroup customers who have a credit card that is co-branded with AT&T.

At some point in time, AT&T decided to launch a customer loyalty program that would offer its customers benefits that are similar to those available in Citigroup's THANKYOU program.   Despite the multitude of names that AT&T could have chosen for its customer loyalty program, AT&T inexplicably elected to use the marks "thanks" and "AT&T thanks," even though AT&T knew about Citigroup's extensive use of, and rights in, the THANKYOU marks and ████████████████████████████████████████████████

████████████.  As soon as Citigroup became aware of AT&T's plans and well before the program was publicly announced, Citigroup expressed its concerns about consumer confusion to AT&T.  Undeterred, on June 2, 2016, AT&T announced that the "thanks" or "AT&T thanks" customer loyalty program would launch this summer.

AT&T continues to assert ownership over the "thanks" brand even though it is nearly identical in sight, sound, and meaning to Citigroup's THANKYOU mark, and AT&T intends to use its marks in connection with a similar customer loyalty program.  The likelihood of consumer confusion in this case is exacerbated by the fact that hundreds of thousands, if not

1

millions, of consumers are already accustomed to seeing the AT&T name used in conjunction with Citigroup's THANKYOU mark due to the parties' co-branded credit cards.  In this unusual circumstance, where a partner in a co-branding arrangement adopts a nearly identical mark to that of its partner, the presence of the AT&T name makes consumer confusion more likely, not less likely.

Finally, it is important to note that Citigroup does not seek to stop AT&T from thanking its customers or from using the term "thanks" in its ordinary meaning when communicating about its customer loyalty and appreciation program.  However, AT&T is not merely using the term "thanks" to say thank you to its customers; it is claiming to own trademark rights in "thanks", including by applying to register the phrase AT&T THANKS with the U.S. Patent and Trademark Office and using the service mark designation (i.e. "$^{sm}$") after the term "thanks" in its advertisements.  Under these circumstances, Citigroup is left with no choice but to seek preliminary relief to protect the goodwill associated with its THANKYOU trademark. Accordingly, Citigroup requests that the Court grant its motion for a preliminary injunction.

## STATEMENT OF FACTS

**A.      Citigroup's Use of the THANKYOU Marks**

Since 2004, Citigroup has offered customer loyalty, reward, and redemption programs in connection with many of its credit cards under trademarks consisting of and/or containing the term THANKYOU.  Declaration of Mary C. Hines ("Hines Decl."), ¶¶ 4-5.  Specifically, Citigroup has used the trademarks THANKYOU, CITI THANKYOU, CITIBUSINESS THANKYOU, THANKYOU FROM CITI, and THANKYOU YOUR WAY in connection with a variety of customer loyalty, reward, incentive, and redemption programs (collectively, the "THANKYOU Marks").  *Id*. at ¶ 5.

2

Citigroup's THANKYOU program allows members to obtain points based on their purchases and qualifying account activity that they can redeem to:  obtain a wide variety of merchandise or gift cards, transfer points to participating travel loyalty programs, shop at certain websites of certain on-line partners, pay certain bills, obtain cash rewards, and/or make donations to charity.  *Id.* at ¶ 6.  Citigroup's partnership with Live Nation allows customers to use THANKYOU points to purchase tickets to concerts and live events.  *Id.* at ¶ 11.  ███████

████████████████████████████████████████████████

████████████████████

Citigroup also offers a set of THANKYOU-branded credit cards, which allow holders to earn an increased number of THANKYOU points for certain types of purchases.  *Id.* at ¶ 13.  For example, the Citi THANKYOU Premier Card gives additional points for purchases made relating to entertainment and dining out.  *Id.* at ¶ 14.  In addition to accruing points, THANKYOU cardholders are also offered certain exclusive benefits, such as sports tickets, concerts, and other experiences that are available through Citigroup's Private Pass® program. *Id.*

Citigroup's THANKYOU customer loyalty, reward, and redemption programs have been extensively advertised and promoted by Citigroup since 2004 and currently have approximately 15 million members in the United States.  *Id.* at ¶ 8.  Citigroup spends tens of millions of dollars annually on advertising and marketing related to the services it offers under the THANKYOU Marks.  *Id.* at ¶ 9.  Citigroup has advertised its THANKYOU Marks on a continuous basis for many years, including through advertisements on television and in print, as well as through direct mail, internet, and social media.  *Id.* at ¶¶ 9-10, Exs. 4-5.  Citigroup also partners with well-known brands, retailers, and celebrities throughout the United States to advertise and

publicize the services it offers under the THANKYOU Marks, including Sears, Amazon, Expedia, Live Nation, Billy Joel, and Katy Perry. *Id*. at ¶ 7, Ex. 2.

**B.     Citigroup's Registrations for the THANKYOU Marks**

Citigroup owns trademark registrations for the THANKYOU Marks with the United States Patent and Trademark Office ("USPTO") in connection with credit card customer loyalty, reward, and redemption programs and/or credit card services.  Declaration of J. Kevin Fee ("Fee Decl."), ¶ 4, Ex. 1.  The USPTO did not require Citigroup to provide evidence of acquired distinctiveness before registering any of the THANKYOU Marks.  *Id.* at ¶ 5, Ex. 1.  Citigroup has continuously used many of the THANKYOU Marks for five consecutive years subsequent to the date of registration and several of its registrations for the THANKYOU Mark have become incontestable pursuant to 15 U.S.C. § 1065.  *Id.* at ¶ 6, Ex. 2.

**C.     AT&T and Citigroup's Co-Branded Credit Cards and THANKYOU Customer Loyalty and Reward Programs.**

AT&T sells a variety of goods and services, including cell phones; cellphone talk, text, and data plans; wireless home phone and internet connectivity plans; and accessories, all of which are sold to customers throughout the United States.  *See* Fee Decl. ¶ 7, Ex. 3.  In addition, since at least as early as 1998, AT&T and Citigroup have issued co-branded credit cards. Declaration of Matthew Schlitz ("Schlitz Decl."), ¶ 4.  In connection with their co-branded cards, Citigroup has partnered and continues to partner with AT&T in connection with the promotion of Citigroup's THANKYOU customer loyalty, reward, and redemption programs.  *Id*. at ¶ 6.  For example, customers of the AT&T Universal Rewards Card can earn THANKYOU points based on qualifying purchases made with their cards, including the ability to earn additional THANKYOU points for each eligible purchase they make from AT&T.  *Id*. at ¶¶ 7, 11.  At least

850,000 U.S. customers earn THANKYOU rewards points in connection with their Citigroup and AT&T co-branded credit cards.  *Id.* at ¶ 8.


AT&T Universal Savings Platinum


AT&T Universal Savings and Rewards

The AT&T Universal Card depicts AT&T's trademarks alongside Citigroup's trademarks, as shown above.  Additionally, advertising and promotional materials for the AT&T Universal Rewards Card feature AT&T's trademarks alongside Citigroup's trademarks, including Citigroup's THANKYOU trademark.  *Id.* at ¶ 10, Ex. 2.





In 2014, Citigroup and AT&T jointly launched the AT&T Access Card, and in 2015 they jointly launched the AT&T Access More Card.  *Id.* at ¶ 5.  The AT&T Access Card and the AT&T Access More Card depict AT&T's trademarks alongside Citigroup's trademarks, as shown above.  *Id.* at ¶ 9, Ex. 1.  Advertising and promotional materials for the AT&T Access Card and AT&T Access More Card shows AT&T's trademarks alongside Citigroup's trademarks, including Citigroup's THANKYOU trademark.  *Id.* at ¶ 10, Ex. 2.

In connection with their co-branding efforts, Citigroup and AT&T and their affiliates have entered into numerous agreements.  ███████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

5

██████████████████████████████████

████████████████████████████

Citigroup and AT&T have engaged in marketing and publicity efforts related to their co-branded credit cards.  Schlitz Decl. ¶ 12.  Citigroup and AT&T's marketing and publicity of their co-branded credit cards have been successful; approximately 1.7 million customers in the United States have credit cards that are co-branded by Citigroup and AT&T.  *Id*. at ¶ 13.

### D.  AT&T's Adoption of the "thanks" and "AT&T thanks" Trademarks

In late March 2016, Citigroup became aware of AT&T's intent to use the "AT&T thanks" trademark.  Hines Decl. ¶ 19.  Shortly thereafter, Citigroup contacted AT&T to express its concern that the proposed "AT&T thanks" trademark was confusingly similar to Citigroup's THANKYOU Marks.  *Id*. at ¶ 20.

After Citigroup contacted AT&T regarding it concerns, AT&T IP filed an application with the USPTO to register the trademark AT&T THANKS in connection with "providing incentive award programs for customers for the purpose of promoting and rewarding loyalty" (the "AT&T Services") on an intent-to-use basis on April 7, 2016.  Fee Decl. ¶ 8, Ex. 4.  Notably, AT&T's application did not disclaim the word "thanks," which would have indicated that AT&T was not claiming an exclusive right to the word "thanks" by itself.

After AT&T filed the application for the AT&T THANKS Mark, Citigroup and AT&T exchanged letters and engaged in additional telephone discussions regarding AT&T's planned use of the mark.  Hines Decl. ¶ 21.  Citigroup again expressed its concern that the proposed "AT&T thanks" mark was confusingly similar to Citigroup's THANKYOU Marks, particularly in light of the similarity between the AT&T Services and Citigroup's THANKYOU loyalty, reward, and redemption programs.  *Id*.  Despite its knowledge of Citigroup's rights in the

THANKYOU Marks and of Citigroup's concerns about the likelihood of confusion between its THANKYOU Marks and AT&T's proposed mark, AT&T announced that it was launching a customer appreciation program in the summer of 2016 under the "thanks" and "AT&T thanks" trademarks. *Id.* at ¶ 22.

Specifically, on June 2, 2016, AT&T Inc. issued a press release announcing the imminent launch of the "AT&T thanks" program, which it describes as an appreciation program for AT&T customers. Fee Decl. ¶ 9, Ex. 5. The press release describes several entertainment benefits that will be available to AT&T customers with no sign-ups and no fees in the summer of 2016, including presale access to concerts and events through Live Nation, who also partners with Citigroup in connection with the THANKYOU program. *Id.*; Hines Decl. ¶ 11. It also states that "surprise offers" and offers tailored to customers based on their services and packages with AT&T would be provided at a later date. Fee Decl. ¶ 9, Ex. 5. The press release used the logo depicted below. *Id.*



On June 2, 2016, AT&T Inc. also posted a page on its website describing the launch of the "thanks" or "AT&T thanks" program. *Id.* at ¶ 10 Ex. 6. This page uses the same logo shown above that was used in the June 2, 2016 press release in connection with the description of the customer appreciation program. *Id.*

AT&T offers its goods and services for sale on the same website on which AT&T Inc. posted the page announcing the launch of the "AT&T thanks" program. *Id.* ¶¶ 10, 12, Exs. 6, 8. In addition, AT&T used a similar logo in connection an animation that AT&T posted on social media sites, as shown below. Fee Decl. ¶ 11, Ex.7.



After Citigroup filed its Complaint, AT&T revised its logo on the "AT&T thanks" website, as shown below.  *Id* ¶ 12, Ex. 8.



## <u>ARGUMENT</u>

To obtain preliminary injunctive relief, a movant must show that:  (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

**A.      Citigroup Is Likely to Succeed on the Merits of Its Claims.**

To succeed on its trademark-infringement claims, Citigroup must establish that: (1) Citigroup owns valid trademarks in the THANKYOU Marks that are entitled to protection under the Lanham Act; (2) AT&T used the "thanks" and/or "AT&T thanks" trademarks in commerce, without Citigroup's consent, in connection with the sale, offering for sale, distribution, or advertising of goods or services; and (3) AT&T's use of the "thanks" and/or "AT&T thanks" marks is likely to cause confusion as to the affiliation, connection, or association of AT&T with Citigroup, or as to the origin, sponsorship, or approval of AT&T's customer loyalty program by Citigroup.  *See 1-800 Contacts, Inc. v. WhenU.com, Inc.*, 414 F.3d 400, 406-07 (2d Cir. 2005).

1.      **Citigroup's THANKYOU Marks are Valid and Protectable.**

Citigroup's THANKYOU Marks are valid and protectable, and AT&T cannot argue

otherwise because ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████

Moreover, Citigroup's federal registrations provide *prima facie* evidence of Citigroup's

valid and exclusive right to use the THANKYOU Marks in commerce in connection with credit

card customer loyalty, reward and redemption programs and credit card services.  15 U.S.C.

§1115(a).  Additionally, Citigroup's three incontestable trademark registrations (Reg. Nos.

3,249,982; 3,948,111; and 3,946,014) constitute conclusive evidence of the validity of

Citigroup's THANKYOU Marks and Citigroup's ownership thereof.  15 U.S.C. § 1115(b).

Lastly, Citigroup has acquired common law rights in the THANKYOU Marks based on

its use of the THANKYOU Marks for twelve years.  Hines Decl. ¶¶ 5-6; *Ritani, LLC v.*

*Aghjayan*, 880 F. Supp. 2d 425, 445 (S.D.N.Y.  2012) (plaintiff accrued common law rights

based on use of trademark).

For all the foregoing reasons, there cannot be a bona fide dispute about whether Citigroup

owns valid rights in the THANKYOU Marks.

2.      **AT&T Used the "thanks" and/or "AT&T thanks" Marks in**
        **Commerce.**

AT&T used the "thanks" and "AT&T thanks" trademarks in commerce.  A trademark is

deemed to be used in commerce on services when "[1] it is used or displayed in the sale or

advertising of services and [2] the services are rendered in commerce."  15 U.S.C. § 1127.

AT&T's use of the "thanks" and "AT&T thanks" marks satisfies both requirements.

9

First, AT&T used the "thanks" and "AT&T thanks" trademarks in connection with the offering for sale and advertising of its goods and services. AT&T issued a press release and posted a page on its website advertising the launch of the "thanks" or "AT&T thanks" program. Fee Decl. ¶¶ 9-10, 12, Exs. 5-6, 8. AT&T offers its goods and services for sale over the same website. *Id.* at ¶¶ 10, 12, Exs. 6, 8. AT&T also used the "thanks" and "AT&T thanks" marks in advertisements on social media. *Id.* at ¶ 11, Ex. 7.

Second, AT&T renders its services in commerce. The Lanham Act defines "commerce" to mean all commerce that may lawfully be regulated by Congress. 15 U.S.C. § 1127; *see also United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.*, 128 F.3d 86, 92 (2d Cir. 1997). AT&T sells a variety of services, including cell phones; cellphone talk, text, and data plans; wireless home phone and internet connectivity plans; and accessories, all of which are sold to customers throughout the United States. Fee Decl. ¶ 7, Ex. 3. AT&T advertises the benefits associated with the "AT&T thanks" program as available to all AT&T customers in good standing. *Id.* at ¶¶ 10, 12, Exs. 6, 8.

Additionally, AT&T's use of the "thanks" and "AT&T thanks" marks was without Citigroup's consent and, in fact, was with actual knowledge of Citigroup's concerns regarding consumer confusion. Hines Decl. ¶¶ 20-22.

3.   **AT&T's Use of the "thanks" and "AT&T thanks" Marks Is Likely to Cause Confusion.**

The Second Circuit applies the eight-factor *Polaroid* balancing test to assess the likelihood of consumer confusion. *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). The factors are: (1) strength of the plaintiff's mark; (2) similarity of the parties' marks; (3) proximity of the parties' products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product or service in the

market of defendant's products or services; (5) evidence of actual confusion; (6) evidence that the defendant's mark was adopted in bad faith; (7) the respective quality of the parties' products or services; and (8) sophistication of consumers in the relevant market.

Not all of the factors are appropriately considered in every case; the Court need only consider sufficient factors to reach the ultimate conclusion as to whether or not there is a likelihood of confusion based on the specific facts of the case and balance those factors. *New Kayak Pool Corp. v. R&P Pools, Inc.,* 246 F.3d 183, 185 (2d. Cir. 2001). "When balancing the factors, district courts generally should not treat any single factor as dispositive; nor should a court treat the inquiry as a mechanical process by which the party with the greatest number of factors wins. Instead, the court "should focus on the ultimate question of whether consumers are likely to be confused." *Playtex Prods. v. Georgia-Pacific Corp.*, 390 F.3d 158, 162 (2d Cir. 2004) (quoting *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000)).

Here, the balance of the relevant factors weighs strongly in favor of a finding of likelihood of confusion. Despite its knowledge of Citigroup's long-standing rights in the THANKYOU Marks, AT&T adopted confusingly similar trademarks in connection with services that are very similar to services Citigroup has offered for twelve years under the conceptually and commercially strong THANKYOU Marks. Consumer confusion is particularly likely because AT&T and Citigroup are well-known collaborators, including in connection with products that are eligible to participate in Citigroup's THANKYOU program.

(a)     **Citigroup's THANKYOU Marks are Strong.**

Analysis of the strength of a trademark encompasses two different concepts: (1) the inherent distinctiveness of the mark; and (2) the extent to which prominent use of the mark in commerce has created a high degree of consumer recognition of the mark. *Virgin Enters. v.*

11

*Nawab*, 335 F.3d 141, 147 (2d Cir. 2003).  Citigroup's THANKYOU Marks are both inherently distinctive and commercially strong.

To assess inherent distinctiveness, trademarks are classified, in ascending order of strength, as (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful.  *TCPIP Holding Co. v. Haar Commc'ns., Inc.*, 244 F.3d 88, 93 (2d Cir. 2001).  Generic marks are those consisting of words identifying the relevant category of goods or services and are not protectable under any circumstances.  *Id.*  Descriptive marks are those consisting of words identifying qualities of the product and are only protectable if they have acquired secondary meaning.  *Id.* at 94.  Suggestive marks and arbitrary or fanciful marks are each inherently distinctive.  *Id.* Suggestive marks are those that are not directly descriptive, but suggest a quality or qualities of the product through the use of "imagination, thought and perception."  *Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 118 (2d Cir. 1999).  Arbitrary or fanciful marks are ones that do not communicate any information about the product either directly or by suggestion.  *See generally Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9-11 (2d Cir. 1976).

Citigroup's THANKYOU Marks are inherently distinctive because they are suggestive. The term "THANKYOU" does not directly describe the qualities of Citigroup's products or services, but instead requires thought or imagination to connect the term with Citigroup's promotion of the goods and services of others through credit card customer loyalty, reward, and redemption programs and credit card services.  As a result, the USPTO registered Citigroup's THANKYOU Marks without requiring proof of secondary meaning, as would have been required for descriptive marks.  Fee Decl. ¶ 5, Ex. 1.  Registration of a trademark with the USPTO without proof of secondary meaning creates a presumption that the marks are at least suggestive and, therefore, inherently distinctive.  *Lane Capital Mgmt. v. Lane Capital Mgmt.*,

192 F.3d 337, 345 (2d Cir. 1999); *PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 563 (2d

Cir. 1990).  As a result, the THANKYOU Marks are inherently distinctive and conceptually

strong.

 The second prong of the strength of the mark analysis focuses on the mark's commercial

strength or acquired distinctiveness.  If a mark has been "long, prominently and notoriously used

in commerce," then consumers are more likely to recognize it.  *Virgin*, 335 F.3d at 148.

Widespread consumer recognition of a mark increases the likelihood that consumers will assume

a similar mark identifies the senior user, and therefore increases the likelihood of consumer

confusion.  *Id.*  The Second Circuit has analyzed the degree to which a mark has acquired

distinctiveness based on factors such as advertising expenditures, consumer studies linking the

mark to a source, sales success, and length and exclusivity of the mark's use.  *See Erchonia*

*Corp. v. Bissoon*, 410 F. App'x 416, 418 (2d Cir. 2011) .

 Citigroup's THANKYOU Marks are commercially strong.  Citigroup has extensively

advertised and promoted the THANKYOU Marks since 2004, including through advertisements

on television and in print, as well as through direct mail, internet, and social media.  Hines Decl.

¶¶ 8, 10.  Citigroup spends tens of millions of dollars annually on advertising and marketing

related to the services it offers under the THANKYOU Marks.  *Id.* at ¶ 9.  As a result of its

advertising and promotional efforts, approximately 15 million members are currently enrolled in

Citigroup's THANKYOU program in the United States.  *Id.* at ¶ 8.

 The strength of Citigroup's THANKYOU Marks not only tips this factor in favor of a

finding of likelihood of confusion, but also affects the analysis of several other *Polaroid* factors.

A strong mark is entitled to a broad scope of protection.  *Virgin*, 335 F.3d at 149; *Lois*

*Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986) (holding that

strong mark was entitled to "liberal application of the law").  Thus, likelihood of confusion will be found even with a lesser degree of similarity between the mark and the allegedly infringing mark and/or between the goods or services provided by the mark's owner and those provided by the alleged infringer.  *See, e.g., Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 239 (S.D.N.Y.  2012) (as strength of mark and similarity of marks increases, there can be confusion even with greater differences in services); *Gucci Am., Inc. v. Gucci*, Case No. 07-civ-6820, 2009 U.S. Dist. LEXIS 124888, at *54-55 (S.D.N.Y. Aug. 5, 2009) (finding likelihood of confusion despite parties offering products that did not compete based in part on strength of GUCCI mark).

       (b)    **AT&T's Marks Are Similar to Citigroup's THANKYOU Marks.**

The similarity-of-marks factor assesses the similarity of the marks in appearance, sound, and meaning.  *See Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1339-40 (2d Cir. 1975).  The Lanham Act requires a court to analyze the similarity of the products in light of the way in which the marks are actually displayed in their purchasing context.  *See, e.g., Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.,* 426 F.3d 532, 538 (2d Cir. 2005)*; Harold F. Ritchie, Inc. v. Chesebrough—Pond's, Inc.*, 281 F.2d 755, 762 (2d Cir. 1960) ("While a side by side comparison of the trademarks … would enable an attentive observer to differentiate them, this is not the test to be applied.  It is the general overall impression which counts.").  When comparing marks to determine the likelihood of consumer confusion, "the correct test is whether a consumer who is somewhat familiar with the plaintiff's mark would likely be confused when presented with defendant's mark alone."  *Clinique Labs., Inc. v. DEP Corp.*, 945 F. Supp. 547, 552 (S.D.N.Y. 1996) (quoting *Direct Marketing of Va., Inc. v. E. Mishan & Sons, Inc.*, 753 F. Supp. 100, 106 (S.D.N.Y. 1990)).

14

AT&T's marks are similar to Citigroup's THANKYOU Marks in appearance, sound, and meaning.  The term "thanks" has the same first five letters as, and is pronounced similarly to, the term "THANKYOU".  *See New York City Triathlon, LLC v. NYC Triathlon Club*, 704 F. Supp. 2d 305, 317 (S.D.N.Y. 2010) (finding NEW YORK CITY TRIATHLON confusingly similar to NYC TRIATHLON CLUB); *Birmingham v. Mizuno United States, Inc.*, Case No. 5-09-cv-566, 2011 U.S. Dist. LEXIS 34696, at *35-37 (N.D.N.Y. Mar. 31, 2011) (finding SOFTHANDS and SOFTHAND CONSTRUCTION confusingly similar); *BIC Corp. v. Far Eastern Source Corp.*, Case No. 99-civ-11385, 2000 U.S. Dist. LEXIS 18226 at *13-14 (S.D.N.Y. Dec. 19, 2000) (finding WITE-OUT and WIPE-OUT were substantially similar due to common use of term OUT and only one letter difference).

As shown below, AT&T uses the term "thanks" separately from the term "AT&T"; it appears on a different line, in a different color, and in all lowercase letters (in contrast to the capital letters used for "AT&T").[1]  *See, e.g., Eksouzian v. Albanese*, 116 U.S.P.Q.2d 1972, 1977 (C.D. Cal. 2015) (ordinary consumer would view terms that appeared on different lines, in different font, and in different color as three separate elements, not an "indivisible symbol."). The font, lowercase letters, and the  shade of blue of AT&T's "thanks" mark are noticeably similar to features of Citigroup's THANKYOU Marks.  Hines Decl. ¶¶ 6, 8, Exs. 1, 3.

  

---

[1] After Citigroup filed its Complaint, in which it noted the separation between the "AT&T" and "thanks" portions of the mark, AT&T replaced the logo on the AT&T thanks page of its website.  This litigation-inspired revision is an acknowledgement that the original logo, which continues to be used elsewhere, was problematic.  As discussed below, this revision is also inadequate because use of the AT&T house mark as part of AT&T's mark does not prevent consumer confusion in this particular case.  In any event, once AT&T used a confusingly similar mark and logo, it had a duty to keep a safe distance from Citigroup's marks, and AT&T's revised logo does not satisfy that duty.  *See Oral-B Labs., Inc. v. Mi-Lor Corp.*, 810 F.2d 20, 24 (2d Cir. 1987) (infringer has duty to keep safe distance from line drawn in injunction).

The term "thanks" also has the same meaning as the term "THANKYOU".  *See Am. Home Prods. v. Johnson Chem. Co.*, 589 F.2d 103, 107 (2d Cir. 1978) (likelihood of confusion found between ROACH INN and ROACH MOTEL to warrant a preliminary injunction); *Playboy Enters. v. Chuckleberry Publ'g, Inc.*, 486 F. Supp. 414, (S.D.N.Y. 1980) (finding likelihood of confusion and holding that term PLAYMEN was as close to term PLAYBOY in appearance and meaning as possible without outright duplication); *Masterpiece of Penn., Inc. v. Consol. Novelty Co.*, 368 F. Supp. 550, 552 (S.D.N.Y. 1973) (ALPINE KING infringed MOUNTAIN KING for artificial Christmas trees because terms had same meaning).

In light of Citigroup's long-standing partnership and co-branding of products and services with AT&T, including products and services that relate to Citigroup's THANKYOU marks, the inclusion of the AT&T house mark in certain versions of AT&T's mark does not prevent, and may actually increase, the likelihood of confusion.

"A consumer need not believe that the owner of the mark actually produced the item and placed it on the market.  The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement."  *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 109 (2d Cir. 2010) (abrogated on other grounds) (quoting *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204-05 (2d Cir. 1979)).  As a result, a likelihood of confusion about whether the defendant's product or service is co-branded in association or affiliation with the plaintiff is actionable.

In cases, such as this one, where the plaintiff alleges a likelihood of confusion as to an association or affiliation between the senior and junior user, conspicuous use of a house mark does not prevent confusion.  *See, e.g., Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 422 (6th Cir. 2012) (agreeing with district court that presence of house mark is not as

important in an association case as when claim is for "palming off" because a party might associate with or sponsor another and still use its own house mark); *Lois Sportswear*, 799 F.2d at 872 (holding that labeling of product with company name did not prevent likelihood of confusion as to whether there was an association between the parties); *A.T. Cross Co. v. Jonathan Bradley Pens Inc.*, 470 F.2d 689, 692 (2nd Cir. 1972) (holding use of house mark *increased* likelihood of confusion between CROSS and LA CROSSE BY BRADLEY because "a purchaser could well think plaintiff had licensed defendant as a second user and the addition is thus 'an aggravation, and not a justification.'"); *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, Inc.*, Case No. 94-civ-2663, 1994 U.S. Dist. LEXIS 17182 (S.D.N.Y. Nov. 30, 1994) (holding  prominent placement of "Tommy Hilfiger" on the label did not prevent confusion regarding whether plaintiff endorsed or sponsored use of its mark); *Nike Inc. v. WNBA Enters. LLC*, 85 U.S.P.Q.2d 1187, 1201-02 (TTAB 2007) (holding addition of a trade name or house mark to otherwise similar marks will not avoid a likelihood of confusion as to whether the goods are associated or sponsored by another entity).

For eighteen years, Citigroup and AT&T have issued co-branded credit cards, including cards that participate in Citigroup's THANKYOU program.  Schlitz Decl. ¶ 4.  Approximately 1.7 million customers in the United States have credit cards that are co-branded by Citigroup and AT&T.  *Id*. at ¶ 13.  These cards and certain advertising and promotional materials for these cards depict AT&T's trademarks alongside Citigroup's trademarks.  *Id*. at ¶¶ 9-10, Exs. 1, 2.  Moreover, at least 850,000 consumers earn THANKYOU rewards points in connection with their AT&T co-branded credit card.  *Id*. at ¶ 8.  As a result of Citigroup and AT&T's co-branding efforts and the marketing efforts associated therewith, hundreds of thousands, if not millions, of consumers are accustomed to seeing the AT&T house mark in connection with Citigroup and its

services, including the THANKYOU points program, and are familiar with the association

between these two companies.  As an illustration of the awareness of the association between

AT&T and Citigroup and its THANKYOU Marks, two of the first four results from a recent

internet search for the search term "AT&T thanks" were to Citigroup's THANKYOU website

and the co-branded AT&T Universal Card.  Fee Decl. ¶ 13, Ex. 9.  In this context, the addition of

the AT&T house mark to "thanks" does not prevent consumers from being confused about

whether Citigroup's THANKYOU program is associated with AT&T's thanks program.

(c)      <strong>The Parties Offer Very Similar Services Under Their<br>Respective Marks.</strong>

The closer the junior user's goods or services are to those the consumer has seen

marketed under the senior user's mark, the more likely that the consumer will mistakenly assume

a common source.  *See Virgin*, 335 F.3d at 150.  "To the extent goods (or trade names) serve the

same purpose, fall within the same general class, or are used together, the use of similar

designations is more likely to cause confusion."  *Lang v. Retirement Living Publ'g Co.,* 949 F.2d

576, 582 (2d Cir. 1991).

Here, both parties offer reward or incentive programs that share the identical purpose of

promoting consumer loyalty.  *See* Hines Decl. ¶¶ 4-5; Fee Decl. ¶¶ 10, 12, Exs. 6, 8.  Because

AT&T's program is in its infancy, the full scope of its loyalty program is currently unknown.

However, the few specific benefits AT&T has announced as part of its "thanks" program are

extremely similar to benefits Citigroup offers in connection with its THANKYOU Marks.

AT&T announced that its program will offer priority presale tickets to concerts and events

through Live Nation.  Fee Decl. ¶¶ 10, 12, Exs. 6, 8.   Citigroup offers priority presale tickets to

concerts and other events through its Citi® Private Pass® program, which is available to all

18

holders of THANKYOU credit cards.  Hines Decl. ¶ 16.  Citigroup also has a partnership with Live Nation that allows customers to use THANKYOU points to buy concert tickets.  *Id.* at ¶ 11.

The markets for the parties' programs offered under their respective marks overlap. AT&T is one of the leading telephone and wireless providers.  Thus, it stands to reason that a substantial number of the 15 million members of the THANKYOU program in the U.S. are also AT&T customers, who will be eligible for the "AT&T thanks" program.  Certainly, customers of the co-branded AT&T Access and AT&T Access More Cards, who are eligible to enroll in the THANKYOU program and are also AT&T customers, will also be eligible for the AT&T thanks program. ██████████████████████████████████████████████████████ ████████████████████████████████████████, which would further bridge any gap between the services offered by the parties under their respective marks.  Hines Decl. ¶ 12.

> (d)     **The Actual Confusion Factor Is Irrelevant or Neutral.**

Actual confusion need not be shown to prevail on a trademark-infringement claim because actual confusion is very difficult to prove and the Lanham Act requires only a *likelihood* of confusion.  *Lois Sportswear,* 799 F.2d at 875; *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 531 (S.D.N.Y. 2011).  Furthermore, where the accused product had not yet been fully launched, the absence of actual confusion, "sheds no light whatever on the problem."  *See TCPIP*, 244 F.3d at 102.

AT&T announced the launch of its program in early June but has not yet begun to offer rewards under the program or to advertise the program in any significant manner.  Thus, there has been virtually no opportunity for actual confusion at this time.  Therefore, this factor is not relevant to the assessment of whether there is a likelihood of confusion.

(e)     **If AT&T Adopted Its "thanks" and "AT&T thanks" Marks in Bad Faith, Then This Factor Also Suggests a Likelihood of Confusion; Otherwise, This Factor Is Neutral.**

A defendant's actual or constructive knowledge of the senior user's mark may indicate bad faith.  *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987).  "[T]he second comer has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer."  *Harold F. Ritchie Inc.*, 281 F.2d at 758.  Prior knowledge accompanied by similarities that indicate the junior user deliberately copied the senior user strongly indicates bad faith.  *See Paddington Corp. v. Attiki Imports & Distribs., Inc.*, 996 F.2d 577, 586 (2d Cir. 1993).

AT&T was unquestionably aware of Citigroup's THANKYOU Marks prior to adopting the "thanks" and "AT&T thanks" marks.  Citigroup's federal registrations for the THANKYOU Marks gave AT&T constructive knowledge of Citigroup's rights in the THANKYOU Marks.  15 U.S.C. § 1072.  Moreover, AT&T had actual knowledge of Citigroup's exclusive rights in the THANKYOU Marks based on its co-branding of products with Citigroup that utilize the THANKYOU Marks.  Schlitz Decl. ¶ 6.  Finally, Citigroup communicated its concerns regarding AT&T's proposed marks directly to AT&T.  Hines Decl. ¶ 21.

Discovery will likely shed additional light on whether AT&T intended to capitalize on Citigroup's reputation and goodwill when it adopted its marks.  Even if Citigroup identifies no direct evidence of AT&T's intent to confuse consumers, evidence of bad intent is not required to establish a likelihood of confusion.  *Birmingham v. Mizuno*, 2011 U.S. Dist. LEXIS 34696, at *54 (quoting *Star Fin. Servs., Inc. v. AASTAR Mortg. Corp.*, 89 F.3d 5, 11 (1st Cir. 1996)).  The absence of evidence of bad faith would not weigh against a finding of likelihood of confusion. *See Heisman Trophy Trust v. Smack Apparel* Co., 637 F. Supp. 2d 146, 156 (S.D.N.Y. 2009) (citing *Beacon Mut. Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8, 19 (1st Cir. 2004) (the

good-faith factor "usually matters only where an alleged infringer copied a mark in bad faith; a converse finding of good faith carries little weight.")).

In any event, AT&T's adoption of a similar mark that uses a similar font and format and a similar color scheme in connection with a customer loyalty program that is very similar to the program Citigroup offers under the THANKYOU Marks despite its constructive and actual knowledge of Citigroup's rights in the THANKYOU Marks is circumstantial evidence of bad faith.  "Where we can perceive freedom of choice with full knowledge of a senior user's mark, we can readily read into a defendant's choice of a confusingly similar mark the intent to get a free ride upon the reputation of a well known mark."  *Dreyfus Fund Inc. v. Royal Bank of Canada*, 525 F. Supp. 1108, 1121 (S.D.N.Y. 1981) (quoting McCarthy on Trademarks § 23:33).

> **(f)**     **The Quality of Defendants' Services Are Irrelevant Where Defendant Has Not Yet Fully Launched Its Services.**

This factor considers whether the senior user's reputation could be "tarnished by [the] inferior merchandise of the junior user."  *See Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 483 (2d Cir. 1996) (internal citations and quotations omitted).  Similar to actual confusion, where the defendant has not yet launched its product or service, the quality of defendant's products or services cannot be known.  *TCPIP*, 244 F.3d at 102.  Thus, this factor is not relevant here.

> **(g)**     **The Relevant Consumers Are Not Particularly Sophisticated.**

This factor considers the impression of the ordinary purchaser buying under normal market conditions and giving the attention such purchasers usually give in buying those goods or services.  *Star Indus. v. Bacardi*, 412 F.3d 373, 390 (2d Cir. 2005).  In general, "the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trademarks will result in confusion concerning the source or

sponsorship of the product." *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992). "Purchasers of relatively inexpensive goods . . . are held to a lesser standard of purchasing care." *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 220 (2d Cir. 1999).

AT&T offers its "thanks" and "AT&T thanks" program to customers for free. Fee Decl. ¶¶ 9-10, 12 Exs. 5-6, 8. Thus, there is no reason to believe that AT&T customers will exercise special care in viewing AT&T's marks. *Nabisco*, 191 F.3d at 220; *see also Playtex Prods. v. Georgia-Pacific Corp.*, 390 F.3d 158, 162-63 (2d Cir. 2004) (consumers do not invest much time or effort in distinguishing among inexpensive bath tissue). Moreover, AT&T's potential customers consist of the general public, who cannot be said to have unique qualities or sophistication. *See CBS Inc. v. Liederman*, 866 F. Supp. 763, 768 (S.D.N.Y. 1994).

### (h)   Summary of the Likelihood of Confusion Factors

AT&T's adoption of the "thanks" and "AT&T thanks" marks, which are similar in sight, sound and meaning to Citigroup's well-known THANKYOU Marks, in connection with its own consumer loyalty and reward program is a recipe for confusion. The likelihood of confusion is exacerbated by the history of collaboration between the parties, which has conditioned consumers to associate AT&T with Citigroup and its THANKYOU program. Thus, the inclusion of the AT&T house mark in AT&T's trademarks does not prevent, and may actually increase, the likelihood of confusion. Accordingly, Citigroup is likely to succeed on the merits of its federal trademark claims.[2,3]

---

[2] At a minimum, Citigroup has established serious questions going to the merits, a balance of hardships that tips decidedly in its favor, and that irreparable injury is likely in absence of injunction, which is a sufficient showing to obtain preliminary injunctive relief. *See Davidoff SA v. CVS Corp.*, 571 F.3d 238, 242 (2d Cir. 2009).

[3] Citigroup's claims for unfair competition under New York common law also require proof of likelihood of confusion and bad faith and are judged in the same manner as a Lanham Act claim. *Info. Superhighway, Inc. v. Talk Am., Inc.*, 395 F. Supp. 2d 44, 56 (S.D.N.Y. 2005). Thus, Citigroup's arguments set forth above also demonstrate that it is likely to succeed under on its common law claims. Similarly, AT&T's suggestion of an affiliation with

### B.      Citigroup Will Suffer Irreparable Harm Absent Injunctive Relief.

Consumer confusion irreparably harms trademark owners by destroying their control over their reputation and consumer goodwill.  *See U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 511 F. App'x 81, 85 (2d Cir. 2013) (affirming district court's holding that loss of control over reputation and goodwill was sufficient to demonstrate irreparable harm); *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 343 (S.D.N.Y. 2010) ("[p]rospective loss of [] goodwill alone is sufficient to support a finding of irreparable harm.").

Here, Citigroup's hard-earned reputation and customer loyalty built through over a decade of using and promoting its THANKYOU Marks are endangered by AT&T's intentional adoption of the "thanks" and "AT&T thanks" marks.  Given the likelihood of confusion between the parties' marks, Citigroup will lose control of the reputation and goodwill it has cultivated in the THANKYOU Marks.  AT&T's products and services offered under the "thanks" and "AT&T thanks" marks may or may not be of the same quality as Citigroup's goods and services and may or may not be consistent with the branding principles Citigroup uses to promote its THANKYOU program.  *See U.S. Polo Ass'n,* 800 F. Supp. 2d at 541.  The harm created by this loss of control is unquantifiable and not capable of redress through monetary damages.  *New York City Triathlon*, 704 F. Supp. 2d at 326.

### C.      The Balance of Harms Weighs Heavily in Favor of Citigroup.

Where the defendant only recently adopted its mark, the balance of hardships weighs in favor of the defendant because the defendant has not yet had time to develop goodwill under the new mark.  *See New York City Triathlon*, 704 F. Supp. 2d at 326 (balance of harms weighed in favor of plaintiff where defendant had "only just" adopted the infringing mark); *Stern's*

---

Citigroup where no affiliation exists misleads New York consumers, which is a violation of N.Y. GEN. BUS. L. § 349.  *See New York City Triathlon,* 704 F. Supp. 2d at 325 n.7.

*Miracle-Gro Prods. Inc. v. Shark Prods. Inc.*, 823 F. Supp. 1077 (S.D.N.Y. 1993) (balance of harms weighed in favor of plaintiff, who had spent over four decades and approximately $100 million dollars advertising its product, compared to defendant, who had used mark for 18 months and presented no evidence it had established any goodwill in the mark). Moreover, when a defendant knowingly adopted a mark that was confusingly similar to the plaintiff's, any injury that it might suffer should be "discounted by the fact that the defendant brought that injury upon itself." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002).

Without an injunction, the harm to Citigroup would far exceed any theoretical harm to AT&T from an improvidently granted injunction. Citigroup has used its THANKYOU Marks for twelve years and has spent tens of millions of dollars per year in advertising and promoting the THANKYOU Marks. Hines Decl. ¶¶ 4, 9. In contrast, AT&T has made only minimal use of the infringing marks to date, and has not done any significant advertising relating to the marks. Moreover, AT&T adopted its confusingly similar marks despite knowledge of Citigroup's rights in the THANKYOU Marks and Citigroup's concerns about consumer confusion, such that any injury to AT&T created by an injunction was caused by AT&T itself. Thus, the balance of harms tips sharply in Citigroup's favor.

### D.    The Public Interest Weighs in Favor of Granting a Preliminary Injunction.

The public has an interest in not being deceived or confused. *U.S. Polo Ass'n, Inc.,* 800 F. Supp. 2d at 541 (finding that where plaintiff demonstrated likelihood of confusion, the public interest favored the issuance of an injunction); *New York City Triathlon*, 704 F. Supp. 2d at 344 ("[T]he public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality."). Because there is a likelihood of confusion here, the public interest weighs in favor of a preliminary injunction. The

public will suffer no injury as a result of an injunction because AT&T can simply select another trademark for its customer appreciation program that is not confusingly similar to Citigroup's THANKYOU Marks.

## **CONCLUSION**

For the reasons discussed above, Citigroup respectfully requests that the Court grant Citigroup's Motion for a Preliminary Injunction.

Respectfully submitted,

Dated:  June 24, 2016            By:       s/ J. Kevin Fee
                                         J. Kevin Fee (JF-5316)
                                         MORGAN, LEWIS, & BOCKIUS LLP
                                         1111 Pennsylvania Avenue, NW
                                         Washington, DC  20004
                                         Phone:  202-739-3000

                                         *Counsel for Plaintiff Citigroup Inc.*