UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

CITIGROUP INC.,

          Plaintiff and Counter Defendant,

                  -v-

AT&T SERVICES, INC.; AT&T
INTELLECTUAL PROPERTY LLC; AT&T
INTELLECTUAL PROPERTY II, L.P.,

          Defendants and Counter Claimants.

-------------------------------------------------------------- X

| |
|---|
| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: <u>August 11, 2016</u> |

16-cv-4333 (KBF)

<u>OPINION & ORDER</u>

KATHERINE B. FORREST, District Judge:

      This is a trademark action concerning the phrases "thank you" and "thanks." Citigroup, a leading financial services company, has offered a customer loyalty, reward, and redemption program using the term "THANKYOU" since 2004. AT&T, a telecommunications giant, began implementing a customer loyalty program using the term "AT&T THANKS" this summer, in 2016. Citigroup initiated this action seeking both damages and an injunction prohibiting AT&T's continued use of this name (ECF No. 1), and has moved for a preliminary injunction that would prohibit that use during the pendency of this litigation. (ECF No. 13.)

      For the reasons stated below, Citigroup's motion for a preliminary injunction is DENIED. At this stage it is Citigroup's burden to prove its entitlement to the substantial remedy of preliminary injunctive relief. On the record as it currently stands, Citigroup has not carried its burden.

I.      FACTUAL BACKGROUND

Citigroup is a well-known financial services company that offers, among other products and services, credit cards.  Since 2004, Citigroup has offered customer loyalty, reward, and redemption programs in connection with many of its credit cards using the marks and brands THANKYOU, CITI THANKYOU, CITIBUSINESS THANKYOU, THANKYOU FROM CITI, and THANKYOU YOUR WAY.  (ECF No. 14-11 ¶¶ 4-5.)

These marks are registered with the United States Patent and Trademark Office, and Citigroup has implemented an enforcement program aimed at protecting its rights in the marks.  (ECF No. 1 Exh. A; ECF No. 51 ¶ 5.)  Certain of the marks are now incontestable.  (Id.)  The USPTO did not require Citigroup to provide evidence of acquired distinctiveness before registering any of the THANKYOU marks.  (ECF No. 14-1 ¶ 5.)  However, the registration for the THANKYOU mark only issued after Citigroup sought reconsideration of the USPTO's initial refusal to register the mark on the grounds that there was a likelihood of confusion between the mark and prior registrations.  (ECF No. 39 ¶¶ 2-5 & Exh. 1.)  The prior registrations that concerned the Examining Attorney were UBS PAINEWEBBER THANK YOU and THANK YOU, NEW SOUTH, both marks associated with banking services.  (Id. Exh. 1.)  Citigroup made a number of arguments against the concern of likely confusion, including pointing out that the earlier registrations were used with house marks, which "avoids any likelihood of confusion," and that while all three companies "share certain commercial and personal banking

services," neither earlier-registered mark "recite[d] credit card services."  (<u>Id.</u> at 4, 6.)

The THANKYOU program allows its 15 million members to redeem points, which are earned through purchases on Citigroup credit cards, to obtain merchandise, services, and other benefits from Citigroup and a number of other brands, retailers, and celebrities that have partnered with Citigroup.  (ECF No. 14-11 ¶¶ 6-7, 8.)  For example, members can use THANKYOU points to purchase tickets to concerts and live events offered by Live Nation, an entertainment company.  (<u>Id.</u> ¶¶ 11 & Exh. 6.)  Members also have access to benefits like pre-sale tickets.  (<u>Id.</u> ¶¶ 15 & 16.)  Citigroup spends tens of millions of dollars annually on advertising and marketing related to the services it offers under the THANKYOU marks.  (<u>Id.</u> ¶ 9.)

Since 1998, Citigroup has partnered with AT&T to offer co-branded credit cards.  (<u>Id.</u> ¶ 17.)  The faces of these credit cards bear the logos of both AT&T and Citigroup (the CITI logo).  (<u>Id.</u> ¶ 18; ECF No. 1 Exh. C.)  The approximately 1.7 million customers who use these cards receive monthly bills that bear both of those logos, as well as the THANKYOU mark and the THANKYOU FROM CITI mark. (ECF No. 14-11 ¶ 18; ECF No. 14-21 ¶ 13.)  At least 850,000 customers earn THANKYOU rewards points in connection with a Citigroup and AT&T co-branded credit card, and certain card holders can earn additional THANKYOU points for each eligible purchase from AT&T.  (ECF No. 14-21 ¶¶ 8 & 11.)  These cards are not accepting new applicants.  (ECF No. 38 ¶¶ 61 & 64.)  The relationship between

3

Citigroup and AT&T has been the subject of numerous written agreements.  (ECF No. 14-19 ¶ 3.)

AT&T initiated plans to offer a customer appreciation program some time before 2015.  (ECF No. 38 ¶ 9.)  The program was planned as, and became, one that would not feature "points" earned by making purchases and later redeemed; it might, however, feature "tiers" such that consumers who do more business with AT&T would have access to better perks.  (Id. ¶¶ 10-15.)

AT&T began efforts to name its upcoming program in September 2015.  (Id. ¶ 22.)  It first tested five names, none of which satisfied decision-makers within AT&T.  (Id. ¶¶ 23-25.)  AT&T tested ten more names in October 2015 and remained dissatisfied.  (Id. ¶¶ 25-26.)  AT&T then considered the name "AT&T Thanks" and tested it alongside two other possible names, "AT&T Rewards" and "The AT&T Advantage."  (Id. ¶¶ 27-29.)  In the ensuing testing "AT&T Thanks" scored well, although generally not as well as "AT&T Rewards."  (Id. Exh. 3.)  Nevertheless, some time before February 2016, AT&T decision-makers decided that "AT&T Thanks" was the best name for the program.  (Id. ¶¶ 29 & 85.)

In February 2016, representatives from Citigroup and AT&T met to discuss efforts to improve the performance of the co-branded cards.  (Id. ¶ 84.)  Although the parties discussed AT&T's efforts to create a loyalty program, the parties dispute when the proposed "AT&T THANKS" title was first disclosed.  AT&T's representatives argue it may have been as early as February 5 and no later than February 14, because one portion of an attachment to an email sent on February 14

4

referred to the program without explaining it.  (Id. ¶ 86.)  Citigroup argues that it was not until months later, possibly as late as June 2, 2016, the day AT&T actually launched its program to the public.  However, the record demonstrates that the name was known well before that announcement.  One of Citigroup's representatives involved in the negotiations stated that in a March 25, 2016 meeting "AT&T made it clear that its current plan was to use AT&T THANKS as a customer-facing name for its loyalty program."  (ECF No. 52 ¶ 6.)  For purposes of this motion, the Court finds that the preponderance of the evidence in the record supports the view that the name of the program was likely communicated some time in February, and in any event no later than March 25, 2016.

On April 7, 2016, AT&T filed an intent-to-use application with the USPTO seeking to register AT&T THANKS.  (Id. ¶ 44.)  The application, which remains outstanding, does not seek to trademark THANKS standing alone, but rather always preceded by the AT&T "house mark."  (Id.; ECF No. 1 Exh. E.)  The trademark application does not disclaim the word "thanks."  (Id.)

The parties continued to meet over the following months.  The two companies discussed possible linkages between their respective loyalty programs.  (Id. ¶ 14.) Citigroup also, starting with the March 25 meeting and on an on-going basis, raised the possibility of confusion between the THANKYOU program and the proposed "AT&T THANKS" program.  (Id. ¶ 6.)  The parties' business and in-house legal staff discussed the name issue several times seeking a settlement.  (ECF No. 38 ¶ 91.)

5

On June 2, 2016, AT&T issued a press release announcing the launch of "AT&T thanks." (ECF No. 14-1 ¶ 9.) The initial benefits of the program included "Ticket Twosdays," by which members could buy one ticket and get a second free, and pre-sale access to Live Nation concerts. (Id. Exh. 6.) AT&T has promoted its program through social media and commercials, and many AT&T customers have been exposed to and taken advantage of the "AT&T THANKS" program – for example, 94,000 customers have received free movie tickets this summer. (ECF No. 38 ¶¶ 51-53.) AT&T plans to unveil additional benefits in the coming months. (Id. ¶ 54.)

Following the June 2 launch and later that week, Citigroup representatives continued to speak with AT&T representatives about changing the program's name. (ECF No. 51 ¶¶ 48-49.) On June 9, 2016, Citigroup filed its complaint initiating this action. (ECF No. 1.) On June 24, 2016, Citigroup filed the instant motion for a preliminary injunction. (ECF No. 13.)

## II. LEGAL STANDARDS

"A party seeking a preliminary injunction must ordinarily establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of

the moving party; and (3) that a preliminary injunction is in the public interest."

New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015).[1]

The Court makes its findings on this preliminary injunction motion by a preponderance of the evidence standard.  AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc., 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010).  The Court's findings of fact and conclusions of law in this proceeding do not preclude reexamination of the merits at a subsequent trial or other stage of the litigation.  Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 644 (2d Cir. 1998).

III.   ANALYSIS

For the reasons stated below, the Court finds that Citigroup has not established either of the first two prongs required for a preliminary injunction, and thus does not need to evaluate the third.

A.   Irreparable Harm

"Irreparable harm is the single most important prerequisite to the Court's issuance of preliminary injunctive relief."  A.X.M.S. Corp. v. Friedman, 948 F. Supp. 2d 319, 336 (S.D.N.Y. 2013) (citing Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009)).  "The injury alleged to be irreparable must be

---

[1] There is a heightened standard when a movant seeks a "mandatory" (status-quo altering) rather than "prohibitive" (status-quo preserving) preliminary injunction: in such cases, the Court asks whether the movant has shown "a clear or substantial likelihood of success on the merits and ma[d]e a strong showing of irreparable harm, in addition to showing that the preliminary injunction is in the public interest."  New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015) (internal citations and quotation marks omitted).  At oral argument, the parties disagreed whether the preliminary injunction Citigroup seeks is mandatory or prohibitive, and this reasonable disagreement reminds the Court that "[d]etermining whether the status quo is to be maintained or upset [can lead] to distinctions that are 'more semantic than substantive.'"  Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995) (alteration omitted) (quoting Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985)).  Because Citigroup has not met the less stringent burden associated with prohibitive preliminary injunctions, the Court need not resolve this point.

actual and imminent, not merely possible." Id. (citing Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005)).

The irreparable harm Citigroup envisions is the loss of its control over the reputation and consumer goodwill toward its THANKYOU marks.[2]  This type of injury, if established, is not precisely compensable and may, under certain circumstances, constitute irreparable harm.  New York City Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F. Supp. 2d 305, 343 (S.D.N.Y. 2010).  The record before the Court on this motion, however, does not sufficiently support a finding of such harm.

The cases Citigroup cites in support of its loss of reputational control theory of irreparable harm demonstrate that evaluating this form of harm involves considering the likelihood of confusion, discussed more fully below, and concrete injuries.  Thus, in New York City Triathlon, the plaintiff advanced evidence of actual confusion on the part of "a highly sophisticated consumer" and specifically explained how the defendant's club would interfere with plaintiff's exclusive relationship with a competing club "operating in the same market space."  Id. Similarly, in U.S. Polo Association, Inc. v. PRL USA Holdings, Inc., 800 F. Supp. 2d 515 (S.D.N.Y. 2011), the court determined the men's fragrances at issue "to be competitively proximate," and held that "absent an injunction, given the likelihood

---

[2] At oral argument, the parties debated whether the traditional presumption of irreparable harm upon a finding of likelihood of success on the merits in a trademark infringement action survives the Supreme Court's decision in eBay Inc. v. MercExchange, L.LC., 547 U.S. 388 (2006), which the Second Circuit in Salinger v. Colting, 607 F.3d 68 (2d Cir. 2010), held erased an analogous presumption in copyright infringement actions.  This question remains unsettled, see U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 511 F. App'x 81, 85 (2d Cir. 2013), and need not detain us because, as discussed infra, Citigroup has not demonstrated its likelihood of success on the merits.

of confusion … the reputation and goodwill cultivated by [the senior user] would be out of its hands."  Id. at 531, 541 (emphasis added).

The evidence of irreparable loss of reputational control Citigroup has advanced in support of the instant motion is much less convincing.  As discussed below, to date there is no evidence of actual confusion by consumers.  Citigroup argues that the goodwill it has built up in its marks is threatened by, among other things, "the many negative comments from consumers related to … AT&T's THANKS program," (ECF No. 50 at 9) and has submitted examples of such comments.[3]  (ECF No. 55, Exh. C.)  In the Court's view, these examples tend to disprove, rather than bolster, Citigroup's theory of irreparable harm.  All of the complaints Citigroup has compiled are attached to announcements of the "AT&T thanks" loyalty program, but most relate to aspects of AT&T's core telecommunications services, such as phone purchase options and data plan prices, rather than the loyalty program itself.  (See id.)  Where these online comments do discuss the loyalty program, they compare it to loyalty programs offered by other telecommunications companies.  (See id.)  Both types of comments tend to demonstrate that consumers associate the AT&T THANKS program with the phone and data services AT&T sells directly, and thus that there is minimal risk that consumers will tend to reevaluate their goodwill toward Citigroup's THANKYOU program.

---

[3] The Court assumes that one could find similar online comments and complaints about most large corporations and does not consider this selection relevant to any issue before the Court other than irreparable harm (for example, quality of product).

9

Additionally, the fact that Citigroup and AT&T have partnered since at least 1998 and have issued more than one million co-branded credit cards (ECF No. 14-21 ¶¶ 4-13) further weakens the case for recognizing irreparable harm on these facts. It is demonstrably the case that there exists some agreement, financial or otherwise,[4] by which each party has agreed to be at least somewhat associated with the other.

Finally, AT&T argues that Citigroup unduly delayed bringing both this action and this motion, and as such should not be allowed to claim irreparable harm. Citigroup argues that it did not delay, but instead acted in a timely manner. Based on the record on this motion, the Court finds that this factor, while not dispositive on its own, does further argue against a finding of irreparable harm.

In short, the delay debate comes down to the date to which Citigroup's initiation of this action (June 10, 2016) and filing of this motion (June 24, 2016) should be compared. Citigroup argues that the relevant comparison date is June 2, 2016, the date AT&T publicly announced the launch of the "AT&T thanks" program. (ECF No. 14 at 7.) AT&T argues that the relevant comparison date is no later than February 14, 2016, the date an AT&T executive sent Citigroup executives an email with an attachment that included a reference to whether "card member benefits and AT&T Thanks program [could] work together on benefits and customer opportunities." (ECF No. 38, ¶ 86 & Exh. 12.) The "four month" versus "three

---

[4] The Court is not privy to the details of the extant relationship between Citigroup and AT&T, but simply notes that such a relationship exists and has for many years.

week" difference is material; AT&T cites cases in which a delay of less than four months negates a presumption of irreparable harm, but no cases suggesting that filing within 22 days is dilatory.  See, e.g., Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985).

The evidence submitted by Citigroup demonstrates that by March 25, 2016, AT&T had "made it clear that its current plan was to use AT&T THANKS as a customer-facing name for its loyalty program." (ECF No. 52 ¶ 6.)  The evidence also demonstrates that Citigroup continued to negotiate in good faith in an effort to address its concerns about AT&T's planned name for the program.  However, although negotiations were ongoing, nothing in the record before the Court on this motion suggests that AT&T ever gave Citigroup comfort that it would not use the name.  Thus, the Court deems March 25, 2016 the date that is appropriate to compare to Citigroup's initiation of this action and motion for a preliminary injunction.  The June 2, 2016 official launch was certainly not an unexpected broadside, especially in light of Citigroup's affirmative invocation of its attorneys and legal action at least as early as April 22, 2016.  (Id. ¶ 7.)  The Court thus concludes that the elapsed period between March 25, 2016 and Citigroup's June 24, 2016 motion cut against Citigroup's request for the extraordinary remedy of a preliminary injunction.

For the reasons stated above, Citigroup has failed to carry its burden to establish that it will be irreparably harmed absent a preliminary injunction.

B.      Success On The Merits

In order to ultimately succeed in this trademark-infringement action, Citigroup must establish that (1) it owns a valid mark entitled to protection under the Lanham Act; (2) AT&T used the mark in commerce without Citigroup's consent; and (3) AT&T's use of the mark is likely to cause confusion as to the affiliation, connection, or association between Citigroup and AT&T or as to the origin, sponsorship, or approval of AT&T's goods, services or commercial activities by Citigroup.  1-800 Contacts, Inc. v. WhenU.Com, Inc., 414 F.3d 400, 406-07 (2d Cir. 2005).  AT&T's opposition to the instant motion only contests whether its use of the "AT&T THANKS" mark is likely to cause consumers to be confused.  This question, in turn, is answered by application of an eight-factor balancing test set forth in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir. 1961).  No single factor is dispositive, nor is the test answered by tallying the factors on each side; Polaroid simply sets forth the way the Court should assess whether consumers are likely to be confused.  Playtex Prods. v. Ga.-Pac. Corp., 390 F.3d 158, 162 (2d Cir. 2004).

1.      Strength of Citigroup's Mark

"The strength of a mark refers to 'its tendency to identify the goods sold under the mark as emanating from a particular source.'"  U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 800 F. Supp. 2d 515, 527 (S.D.N.Y. 2011) (quoting Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 873 (2d Cir. 1986)).  "The strength of a trademark encompasses two different concepts, both of which

relate significantly to likelihood of consumer confusion." <u>Virgin Enters. Ltd. v. Nawab</u>, 335 F.3d 141, 147 (2d Cir. 2003).  The first concept is inherent distinctiveness, which relates to the extent to which the mark intrinsically communicates information about the product, while the second concept is acquired distinctiveness, which relates to fame and consumer recognition.  <u>Id.</u>

Courts evaluate inherent distinctiveness of a mark in part by placing the mark into one of five categories; because neither party claims Citigroup's THANKYOU marks are generic, arbitrary, or fanciful, only two of those categories need be discussed.  Descriptive marks "describe a product or its attributes." <u>TCPIP Holding Co. v. Haar Commc'ns, Inc.</u>, 244 F.3d 88, 93 (2d Cir. 2001).  Suggestive marks, in contrast, "require[] imagination, thought and perception to reach a conclusion as to the nature of goods." <u>Abercrombie & Fitch Co. v. Hunting World, Inc.</u>, 537 F.2d 4, 11 (2d Cir. 1976) (quoting <u>Stix Prods., Inc. v. United Merchants & Manufacturers Inc.</u>, 295 F. Supp. 479, 488 (S.D.N.Y. 1968)).  "In determining whether a mark should be classified as descriptive or suggestive, the court must focus on how the mark is used in context, rather than on its use in the abstract." <u>Estee Lauder Inc. v. The Gap, Inc.</u>, 108 F.3d 1503, 1509 (2d Cir. 1997).

Because the United State Patent and Trademark Office registered the THANKYOU marks without requiring proof of secondary meaning, Citigroup enjoys a presumption that the marks are suggestive, rather than merely descriptive.  <u>Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.</u>, 192 F.3d 337, 345 (2d Cir. 1999).  This is simply a burden shifting scheme, however, and one that predominantly

relates to efforts to have a mark declared invalid and non-enforceable.  See id.  The validity of Citigroup's marks, several of which are acknowledged by all to be incontestable, is not at issue in this litigation.  Instead, the classification question relates solely to the Polaroid likelihood of confusion analysis, in which incontestability is properly considered as to scope of protection but not necessarily definitive.  Gruner + Jahr USA Pub. v. Meredith Corp., 991 F.2d 1072, 1077-78 (2d Cir. 1993).

 "The classification of a mark is a factual question.  The factual issue presented is how the purchasing public views the mark."  Id. at 344.  On the factual record presented by this motion, the fact that thanking a customer is a fair and common description of the purpose of loyalty programs generally suggests a lesser scope of protection.  "The trademark right does not protect the exclusive right to an advertising message—only the exclusive right to an identifier, to protect against confusion in the marketplace.  Thus, as a matter of policy, the trademark law accords broader protection to marks that serve exclusively as identifiers and lesser protection where a grant of exclusiveness would tend to diminish the access of others to the full range of discourse relating to their goods."  Virgin Enterprises, 335 F.3d at 147-48.  However, the record on this motion for a preliminary injunction is necessarily underdeveloped, and further evidence of the purchasing public's view of Citigroup's marks could prove important.

 Courts evaluate the second strength concept, acquired distinctiveness, on the basis of a fact-intensive inquiry.  On the one hand, "[i]f a mark has been long,

prominently and notoriously used in commerce, there is a high likelihood that consumers will recognize it from its prior use.  Widespread consumer recognition of a mark previously used in commerce increases the likelihood that consumers will assume it identifies the previously familiar user, and therefore increases the likelihood of consumer confusion if the new user is in fact not related to the first." Id. at 148.  On the other hand, "use of part or all of a mark by third parties weakens the mark's overall strength," BigStar Entm't, Inc. v. Next Big Star, Inc., 105 F. Supp. 2d 185, 203 (S.D.N.Y. 2000), and can condition purchasers to expect different sources for specifically different goods and services bearing part or all of the same mark.  Nat'l Cable Television Ass'n v. Am. Cinema Editors, Inc., 937 F.2d 1572, 1579 (Fed. Cir. 1991).

Both sides present evidence in favor of their positions on acquired distinctiveness.  Citigroup points out that it has spent tens of millions of dollars annually for many years advertising its THANKYOU programs, which count as many as 15 million people in the United States as members.  (ECF No. 14-11 ¶¶ 8-9.)  Generally, a long-established program backed by significant and continuous advertising expenditures and sales success favors a finding of strong acquired distinctiveness.  See Erchonia Corp. v. Bissoon, 410 F. App'x 416, 418 (2d Cir. 2011). It is notable, however, that the record before the Court suggests that the advertising expenditures may be most associated with the contents of the program, while the program's name or branding may or may not be a significant particularized component.  Put otherwise, it is unclear to the Court whether the

millions of dollars in expenditures have been aimed at purchasing brand awareness. The Court will not resolve this question on this motion.

AT&T has advanced evidence indicating that, both before Citigroup first began using its THANKYOU mark and since that time, there are and have been dozens upon dozens of goods, services, and entities that made use of variations on the words "thanks" and "thank you," including by registering their marks with state and federal registers.  (ECF No. 38 ¶¶ 35-43.)  A number of these are explicitly registered as loyalty or reward programs.  (See id.)  Such evidence undermines the argument for distinctiveness.  Estee Lauder, 108 F.3d at 1511.  Indeed, Citigroup acknowledged that other corporations made use of the "common term" THANK YOU in its trademark prosecution, but argued at the time that consumers "can readily distinguish between such marks without confusion."  (ECF No. 39 Exh. 2 at 4.)

The present evidentiary record does not permit the Court to draw firm conclusions regarding acquired distinctiveness.  Citigroup's loyalty programs are well-established, but seems to exist in a marketplace in which names similar to the THANKYOU marks are used by other producers, thus undercutting their distinctiveness.[5]  There is no evidence in the record about the consumer penetration of the third-party uses AT&T collects.  See 24 Hour Fitness USA, Inc. v. 24/7

---

[5] As discussed further below, there is tension between Citigroup's argument that its THANKYOU marks are commercially distinctive for purposes of evaluating their strength but are not "top-of-mind" for purposes of designing consumer confusion surveys.

Tribeca Fitness, LLC, 447 F. Supp. 2d 266, 272-73 (S.D.N.Y. 2006).  All told, resolution of this point will require a more-developed evidentiary basis.

Considering the strength of Citigroup's THANKYOU marks in terms of both their inherent distinctiveness and their acquired distinctiveness will require additional facts.  On the record as it stands today, this factor weighs slightly against a finding of likelihood of confusion.

2.    Similarity of the Parties' Marks

This factor assesses the similarity of the marks in appearance, sound, and meaning.  Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons, 523 F.2d 1331, 1339-40 (2d Cir. 1975).  The question for the court is the general overall impression of the marks as they are actually displayed in their purchasing context.  Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp., 426 F.3d 552, 538 (2d Cir. 2005).

The marks bear certain obvious similarities, at least when considered in the abstract: "AT&T THANKS" and "THANK YOU" share five central letters, are partially pronounced similarly, and both convey a message of gratitude.

Certain other similarities and differences are difficult to judge on the present record.  As discussed above, Citigroup has registered a number of similar marks, including THANKYOU FROM CITI, CITI THANKYOU, and simply THANKYOU. (ECF No. 14-11 ¶¶ 4-5.)  The evidence of Citigroup's THANKYOU marks shows that they are frequently, although not always, presented as lowercase white letters on a blue rectangular background, with the letters "you" presented in a thicker font and

17

with no obvious space between the "k" and the "y."  (ECF No. 14 at 15.)  The words "from citi" frequently also appear below and to the right of the "thankyou" text, with the word "citi" bearing a red arc between its two "i"s.  (Id.; ECF No. 14-11 Exh. 1.) In other circumstances, Citigroup has colored its mark in orange and not set it against a distinct background, and it has also referred to its rewards program in text as "ThankYou."  (ECF No. 1, Exh. B.)

The relevant point of comparison is AT&T's current usage of its applied-for trademark.  When AT&T first launched "AT&T thanks," it used a logo which featured "AT&T" in capital letters on one line and "thanks" below it in blue font. (ECF No. 14 at 15.)  The word "thanks" was rendered in a sans serif font similar, but not identical, to the font used in Citigroup's THANKYOU logo.  Since then, however, AT&T "has abandoned" that logo in favor of one that places the words "AT&T THANKS" on a single line in all capital letters rendered in a black font. (ECF No. 37 at 18-19.)  While the earlier logo remains visible on at least some online sites and accounts, the record suggests movement toward broader, and eventually universal, usage of the single-line, all capital "AT&T THANKS" logo. (ECF No. 53 ¶¶ 29-30.)

There are also, however, important differences that are properly before the Court in the instant motion, and as discussed above among the most important is the consistent use of a house mark in connection with the AT&T THANKS program. AT&T represents that it "does not use THANKS alone – it uses AT&T THANKS." (ECF No. 37 at 17.)  The evidence in the record supports that assertion.  Under

18

certain circumstances, "prominent use of [a junior user's] well-known house brand … significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products."  Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 46 (2d Cir. 2000).

      Citigroup argues that house marks do not reduce the likelihood of confusion in this case because AT&T has co-branding relationships with both Citigroup and other third parties, and as such the presence of AT&T's mark does not clearly communicate that the marked product is not from or associated with another corporation.  This history of co-branding, Citigroup argues, makes the instant situation one in which "the addition of a trade name does not necessarily alleviate the problem of confusion of marks, and indeed, can aggravate it, as a purchaser could well think plaintiff had licensed defendant as a second user."  Playtex Prods., Inc. v. Ga-Pac. Corp., 390 F.3d 158, 165 (2d Cir. 2004) (quoting Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 395 (2d Cir. 1995)).

      The limited evidence in the record of AT&T's use of the mark suggests that this is a circumstance in which the use of a house mark clearly lessens, rather than increases, the chance of consumer confusion.  For example, in the printouts of the AT&T THANKS website submitted by Citigroup, the mark "AT&T THANKS" is always presented in capital letters and in blue font[6] where most of the text is black. (ECF No. 53 Exh. L.)  Additionally, other companies that partner with AT&T for this loyalty program, such as AMC Theatres and Live Nation, are specifically

---

[6] It is not clear if the color of the text, in this case, indicates a clickable hyperlink.

identified, decreasing the chances that a consumer would believe that Citigroup was associated with the program despite not being identified.

Therefore, the Court determines that AT&T's use of a house mark tips this factor in favor of a finding that confusion is not likely.

### 3.   Proximity of the Parties' Products

"This factor focuses on whether the two products compete with each other. To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion." Savin Corp. v. Savin Grp., 391 F.3d 439, 458 (2d Cir. 2004) (quoting Lang v. Retirement Living Publ'g Co., 949 F.2d 576, 582 (2d Cir. 1991)). "In assessing this factor, 'the court may consider whether the products differ in content, geographic distribution, market position, and audience appeal.'" Id. (quoting W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567, 573 (2d Cir. 1993)).

Citigroup focuses on the similarities between the two loyalty programs themselves. Although the AT&T THANKS program was only recently unveiled and may yet develop additional features, the two programs already share certain important attributes. Most tangibly, both participants in AT&T THANKS and holders of Citigroup's THANKYOU credit cards have access to priority pre-sale tickets to concerts and other events through Live Nation, a major entertainment corporation. (ECF No. 14-1, Exhs. 6 & 8; ECF No. 14-11 ¶ 16.) It is not hard to imagine further similarities and areas of overlap developing; the Court notes that the email attachment AT&T cites in order to demonstrate Citigroup's earliest

20

knowledge of the AT&T THANKS program inquired whether "card member benefits" on the parties' co-branded credit card could "work together on benefits and customer opportunities" with AT&T THANKS.  (ECF No. 38 Exh. 12.)

AT&T's first response is that the programs are not in fact similar, largely because Citigroup's THANKYOU program is a points-based redemption program while AT&T THANKS benefits are available to all members without requiring redemption.  (Id. ¶¶ 13-14.)  AT&T also argues that the perks available through AT&T THANKS "deliver on the core value of AT&T's television, internet, telephone, and wireless services," while the perks available through the THANKYOU program are "products and services unrelated to [Citigroup's] credit card offerings."  (Id. ¶ 108.)  On the limited record available to the Court, neither of these differences are immediately compelling.  A consumer shopping for a loyalty program (as discussed below, the existence of such a consumer is far from certain) may not distinguish between the loyalty "ecosystems" necessary to access, for example, pre-sale concert tickets.  As to the second point, on this record it seems facially untrue: movie and concert tickets are at best tangentially related to telecommunications and bear no greater relationship to that service than to the provision of credit cards.

AT&T's more fundamental response is that the proper level of analysis is on the actual products Citigroup and AT&T offer for sale, banking and credit cards compared with telecommunication services.  Notwithstanding the undeniable fact of corporate interrelationships (evidenced by, inter alia, the parties' co-branded credit cards), products in these fields do not compete and do not serve the same purpose.

They are arguably used together, but then again finance and telecommunication are arguably used alongside every other conceivable industry.

Moreover, AT&T points out that Citigroup, in its prosecution of the THANKYOU trademark, argued for a services-level analysis.  In that prosecution, the United States Patent and Trademark Office had initially refused registration because other financial institutions had already registered loyalty program titles similar to THANKYOU.  (ECF No. 39, Exh. 1 at 1.)  Citigroup drew a much finer line than the one separating banking and telecommunications when it argued that even though it and the earlier registrants "may share certain commercial and personal banking services," there would be no likelihood of confusion because the THANKYOU program was associated with credit card services, which the other cited marks did not recite.  (Id. at 6.)  Thus, before the USPTO, Citigroup adopted the position that differences in the core products promoted by similarly named loyalty programs justified a determination that those loyalty programs were unlikely to be confused for one another, even when all of the offering entities were banks.

The Court tends to be of the view that the proximity of rewards programs must be considered in the context of the core services the programs promote.  The two are necessarily connected.  This is even more evident where the core services for sale are purchased with care (see discussion of consumer sophistication below).  This understanding is consistent with "the Lanham Act's purpose of 'protecting persons engaged in commerce within the control of Congress against unfair

22

competition.'" <u>POM Wonderful LLC v. Coca-Cola Co.</u>, 134 S. Ct. 2228, 2234 (2014) (internal alterations and quotation marks omitted) (quoting <u>Lexmar Int'l, Inc. v. Static Control Components, Inc.</u>, 134 S. Ct. 1377, 1389 (2014)).  As a general matter Citigroup and AT&T simply are not competitors.[7]  Their rewards programs are therefore not proximate to one another.

This determination suffices to establish that, for purposes of this motion, the proximity factor weighs against the likelihood of confusion.  The Court emphasizes, however, the necessarily contingent nature of this ruling.  A more complete record could well engender a different analysis.[8]

4.     <u>"Bridging the Gap"</u>

The "bridging the gap" factor "looks to either the likelihood that [Citigroup] will enter [AT&T's] business or the average customer's perception of the likelihood that the plaintiff would enter the defendant's market."  <u>The Sports Authority, Inc. v. Prime Hospitality Corp.</u>, 89 F.3d 955, 963 (2d Cir. 1996).  There is no evidence in the record suggesting Citigroup plans to offer telecommunications services, and the sole potential entanglement Citigroup advances in connection with this factor (ECF No. 14-11 ¶ 12) is too minor to constitute entering the market.  Accordingly, the

---

[7] The Court does note that if AT&T were to partner its AT&T THANKS program with a financial services provider the parties' status as non-competitors could change significantly.

[8] By way solely of example, it occurs to the Court that for many Americans, both a cell phone and a credit card have come to seem more like necessities than luxuries.  It is conceivable (although wholly unsupported by the current record) that some consumers might focus their purchasing decisions within those fields on loyalty and rewards programs.  Whether consumers making purchasing decisions with that level of focus and attention could be misled by the marks at issue here is yet another question.

Court finds that this not-particularly-weighty factor does not favor a likelihood of consumer confusion.

        5.    <u>Actual Confusion</u>

AT&T THANKS only launched at the beginning of this summer, so it is not entirely surprising that there is as of yet no anecdotal evidence of actual confusion. AT&T has indeed advertised and promoted its new program throughout the summer (ECF No. 38 ¶ 53), which does increase the salience of this absence, but standing alone this fact would only weigh slightly against a finding of likely confusion.

However, AT&T has also submitted affirmative evidence of a lack of confusion in the form of three <u>Eveready</u> surveys.  In one of the surveys, 200 participants were shown the AT&T THANKS webpage and then asked what company they believed offered the featured program and whether that company had a business affiliation with any other company.  (ECF No. 40 ¶¶ 9-10.)  In the other two, 400 participants were shown one of two AT&T THANKS commercials and then asked what company they believed offered the featured program and whether that company had a business affiliation with any other company.  (ECF No. 41 ¶ 10-13.)  Of these 600 survey participants, only one individual indicated that she believed the company that promoted the product in the commercial she had just witnessed had an association with Citigroup.  (<u>Id.</u> at ¶ 14.)  From this data, both of the survey administrators concluded that confusion was unlikely.  (ECF No. 40 ¶ 13 ("no likelihood of confusion"); ECF No. 41 ¶ 15 ("not likely to cause confusion").)

Citigroup's rebuttal report argues against the propriety of using an <u>Eveready</u> protocol for confusion testing in this case.  (ECF No. 56.)  The primary flaws Citigroup alleges are two-fold.  First, because in an <u>Eveready</u> survey the senior user's mark is not shown, it can underestimate confusion if the senior user's mark has low "top-of-mind" awareness, which Citigroup's expert argues it does.[9]  (<u>Id.</u> ¶¶ 12-18.)  Second, because in an <u>Eveready</u> survey the senior and junior marks are not shown together, it can underestimate confusion if they are in fact frequently shown together in the real world.  (<u>Id.</u> ¶¶ 19-22.)  Citigroup also argues that the surveys AT&T conducted are flawed in that they prompt overly careful attention, are improperly leading because they follow screening questions about telecommunications, and are not independently validated.  (<u>Id.</u> ¶¶ 23-25.)

Citigroup's critiques of the surveys may indicate that further surveys of a different design would shed additional light on this factor.  However, they do not depreciate the existing surveys' value completely.  In fact, courts have reasoned that where a plaintiff brings a trademark-infringement action, that party's "failure to offer a survey showing the existence of confusion is evidence that the likelihood of confusion cannot be shown."  <u>Essence Commc'ns, Inc. v. Singh Indus., Inc.</u>, 703 F. Supp. 261, 269 (S.D.N.Y. 1988).  Thus, the absence of anecdotal evidence of actual confusion, combined with AT&T's surveys demonstrating, within the constraints of

---

[9] Again, the Court notes the tension between this critique of the <u>Eveready</u> survey design and Citigroup's argument that its advertising expenditures have created acquired distinctiveness for its marks.

their survey design, no likelihood of confusion, jointly weigh against a finding of a likelihood of confusion.

### 6.   Bad Faith

"Bad faith is shown by demonstrating that the 'defendants adopted their mark with the intention of capitalizing on the plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'" Brockmeyer v. Hearst Corp., 248 F. Supp. 2d 281, 298 (S.D.N.Y. 2003) (alterations omitted) (quoting Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 397 (2d Cir. 1995)). "Actual or constructive knowledge" of another company's prior registration and use of a mark "may signal bad faith." Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 259 (2d Cir. 1987). However, "awareness of the plaintiff's mark does not mean that [defendant] acted in bad faith," at least if defendant "reasonably concluded that there would be no confusion between their mark used as it would be used and the plaintiff's use of his mark." Brockmeyer, 248 F. Supp. 2d at 299.

AT&T considered and tested a number of potential names for its loyalty program. (ECF No. 38 ¶¶ 23-29.) The record does not contain any evidence from which the Court could either determine or infer that the name was selected with an eye to Citigroup's pre-existing program. However, the record of AT&T's name-selection process is necessarily limited in this pre-discovery procedural posture. Accordingly, this factor either tips slightly toward AT&T's position or is neutral.[10]

---

[10] This factor would be more-or-less neutral even if AT&T were to definitively demonstrate its good faith; only a finding of bad faith carries much weight in the Polaroid balancing test for consumer confusion. See Heisman Trophy Trust v. Smack Apparel Co., 637 F. Supp. 2d 146, 156 (S.D.N.Y. 2009) (citing Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp., 376 F.3d 8, 19 (1st Cir. 2004)).

7.     Quality of the Parties' Products

The Court finds that the evidence in the record on this motion does not support a firm determination regarding the qualities of either parties' products[11] one way or another.  Accordingly, this factor is neutral.

8.     Consumer Sophistication

"Consumers who are highly familiar with the particular market segment are less likely to be confused by similar marks and may discern quite subtle distinctions.  Conversely, unsophisticated customers lack this discrimination and are more vulnerable to the confusion, mistake and misassociations against which the trademark law protects."  Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 220 (2d Cir. 1999).  This factor is confusingly titled, as it really seeks to measure not whether the consumers of a particular product are "sophisticated," but instead whether the product is one that consumers purchase with care and attention.  See Playtex Prods., Inc. v. Ga.-Pac. Corp., 390 F.3d 158, 162-63 (2d Cir. 2004).

Whether the appropriate level of analysis is the loyalty program or the core service, the Court's view at this stage of the proceedings is that the relevant consumers are likely to make a sophisticated, reasoned choice.  The telecommunications industry is competitive and many, if not the large majority, of the services AT&T sells involve recurring monthly costs that can stretch into the hundreds of dollars.  (ECF No. 38 ¶ 16.)  These are not inexpensive, one-off

---

[11] Indeed, as discussed above it is not entirely clear which "products" should be compared – the loyalty programs or the core services.

purchases like "ordinary grocery store foods" or "bath tissues." <u>Nabisco</u>, 191 F.3d at 220; <u>Playtex Prods.</u>, 390 F.3d at 162.

If, in the alternative, the relevant consumers are those seeking a loyalty or rewards program, they too would seem to be sophisticated, as they clearly take into account the attributes associated with the products they purchase. The Court is not persuaded by Citigroup's argument that because the relevant consumers receive the AT&T THANKS program "for free" they will presumably exercise less care in considering the marks than they would if they paid for the program. (ECF No. 14 at 22.) Those consumers only receive the AT&T THANKS program "for free" once they are AT&T customers in the first place. Moreover, not paying directly for a loyalty program does not render it <u>gratis</u>; a phrase about a free lunch comes to mind.

The Court finds that, based on the limited evidence provided on this point in the present record, the relevant consumers are likely to make their purchasing decisions carefully. Therefore, this factor weighs against a finding of likely confusion.

            9.    <u>Summary of the Polaroid Analysis</u>

Important questions about the likelihood of consumer confusion, and thus Citigroup's likelihood of success on the merits, remain unanswered and await further factual development. No party should confuse the Court's factual determinations on this motion for a preliminary injunction for law of the case. However, on the record presently before the Court, all of the <u>Polaroid</u> factors are either neutral or weigh against a current finding of likelihood of confusion.

Citigroup has therefore not carried its burden to establish a likelihood of success on the merits.

C.     Balance Of The Hardships

In the Second Circuit, as discussed above, even where a preliminary injunction movant has not established a likelihood of success on the merits, it may nonetheless be entitled to the relief sought if it establishes "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward [it]." Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010) (quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979)).  The Second Circuit has emphasized the "decidedly" aspect of this standard and explained that it is no lighter a burden to bear than the burden of proving likelihood of success on the merits.  See id.

On this record, the Court cannot conclude that Citigroup has carried its burden.  For the reasons discussed above, there has not been an adequate showing of irreparable harm from the continued existence of AT&T THANKS while this litigation continues.  Against that lack of a showing, AT&T has advanced concrete evidence that requiring it to halt use of the "AT&T THANKS" name would be an expensive and significant disruption.  (ECF No. 38 ¶¶ 116-18.)  Citigroup's argument that AT&T in effect assumed this risk when it launched its program over Citigroup's objections has persuasive force, see, e.g., Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 596 (3d Cir.

29

2002), but does not suffice to meet its burden on this prong absent a demonstration of irreparable harm.  Therefore, Citigroup cannot take advantage of the "sufficiently serious question" standard for preliminary injunctions.

IV.   CONCLUSION

For the reasons stated above, Citigroup's motion for a preliminary injunction (ECF No. 13) is DENIED.


SO ORDERED.

Dated:        New York, New York
              August 11, 2016

                                    _____
                                         KATHERINE B. FORREST
                                         United States District Judge